Opinions of the Colorado Supreme Court are available to the
public and can be accessed through the Judicial Branch's
homepage at http://www.courts.state.co.us. Opinions are also
posted on the Colorado Bar Association's homepage at
http://www.cobar.org.

ADVANCE SHEET HEADNOTE
May 24, 2021

**2021 CO 35**

**No. 20SC6, *People v. Johnson*—Searches, Seizures, and Arrests—Competency
of Impeachment Evidence—Necessity and Scope of Proof.**

In this opinion, the supreme court reviews a decision of a divided panel of
the court of appeals holding that the trial court reversibly erred by forcing the
defendant to choose between excluding unconstitutionally seized evidence and
fully pursuing an alternate suspect theory at trial, thereby violating the
defendant's right to present a complete defense. The supreme court holds that the
impeachment exception to the exclusionary rule does not extend to a defendant's
truthful, yet incomplete, presentation of evidence: A defendant may offer such
evidence, under the particular circumstances here, without opening the door to
previously suppressed evidence.

Accordingly, the judgment of the court of appeals is affirmed.

## The Supreme Court of the State of Colorado

2 East 14th Avenue • Denver, Colorado 80203

## 2021 CO 35

**Supreme Court Case No. 20SC6**
*Certiorari to the Colorado Court of Appeals*
Court of Appeals Case No. 16CA152

**Petitioner:**

The People of the State of Colorado,

v.

**Respondent:**

Elmo Jesse Johnson.

**Judgment Affirmed**
*en banc*
May 24, 2021

**Attorneys for Petitioner:**
Philip J. Weiser, Attorney General
William G. Kozeliski, Senior Assistant Attorney General
    *Denver, Colorado*

**Attorneys for Respondent:**
Megan A. Ring, Public Defender
Stephen C. Arvin, Deputy State Public Defender
    *Denver, Colorado*

**JUSTICE BERKENKOTTER** delivered the Opinion of the Court.
**JUSTICE MÁRQUEZ** dissents.

¶1     We review the court of appeals' split decision in *People v. Johnson*, 2019 COA 159, __ P.3d __, reversing Elmo Johnson's conviction for first degree murder and remanding the case for a new trial based on the division's determination that the trial court violated Johnson's right to present a complete defense. We consider, as a matter of first impression, whether the impeachment exception to the exclusionary rule extends to a defendant's truthful testimony that could mislead a jury.[1] We hold that a defendant may offer truthful, albeit potentially incomplete, evidence without opening the door to previously suppressed evidence. Accordingly, we affirm the judgment of the court of appeals.

## I. Facts and Procedural History

¶2     Johnson lived in an apartment with his sister, Toni Carrethers, and Carrethers's husband. One night, Johnson's girlfriend, Danielle Griego, stayed at the apartment and was shot and killed.

¶3     The next day, Griego's mother discovered Griego's body on a couch in the apartment. Johnson was laying next to Griego, unconscious due to his

---

[1] We granted certiorari to consider the following issue:

  1. Whether the court of appeals erred in holding that the exclusionary rule precludes the prosecution from offering constitutionally suppressed evidence in response to defense-elicited truthful, yet incomplete evidence that may mislead the jury.

consumption of alcohol and drugs. Griego's mother called 911. Before police officers arrived, Carrethers picked up two shell casings that were near Griego's body, rinsed them, returned them to where she had found them, and then washed her hands.

¶4 Johnson was transported to the hospital, where officers collected swabs from his hands and face while he remained unconscious. These swabs tested positive for gunshot residue ("GSR"), as did swabs the police subsequently collected from Carrethers and Griego's mother. After he regained consciousness, Johnson denied killing Griego.

¶5 As pertinent here, the prosecution charged Johnson with first degree murder. Before trial, Johnson moved to suppress the GSR evidence that the officers collected from his hands and face at the hospital without a warrant. The trial court granted Johnson's motion concerning the GSR evidence. In ruling, the trial court noted that it would not allow Johnson "to use the Fourth Amendment as both a shield and a sword." Concerned that Johnson may "mislead[] the jury into believing that . . . [he] was never tested or he was not positive" for GSR, the court indicated that if Johnson offered evidence regarding Carrethers's positive GSR test, he would open the door for the prosecution to admit his suppressed positive test results.

¶6     At trial, the court asked whether Johnson intended to introduce evidence that Carrethers tested positive for GSR. Johnson's counsel responded that he planned to do so as part of Johnson's alternate suspect defense. He explained that he would lay the proper foundation through two of the prosecution's witnesses: the crime scene investigator, who swabbed Carrethers for GSR, and the GSR analyst, who tested Carrethers's swabs.

¶7     The trial court ruled that if Johnson elected to introduce evidence of Carrethers's positive GSR test results, then the prosecution would be allowed, under CRE 403, to introduce evidence with respect to all the GSR test results, including Johnson's, notwithstanding the court's previous suppression order. The court reasoned that Johnson's introduction of Carrethers's positive GSR test results could mislead the jury into thinking that Johnson did not test positive for GSR or that he wasn't tested at all and the investigation into Griego's death was "subpar." Johnson's counsel objected, asserting that the court's ruling put him "in a position of having to make a *Hobson* [sic] choice of either deciding to present a defense and render ineffective assistance of counsel or to have this unconstitutionally obtained evidence come in against Mr. Johnson."

¶8     Johnson elected not to inquire into Carrethers's GSR test results. The jury ultimately found Johnson guilty of first degree murder.

¶9 Johnson appealed his judgment of conviction, contending that the trial court erred by forcing him to choose between exercising two constitutional rights: his right to present a complete defense and his right to exclude constitutionally inadmissible evidence at trial. In a published, split decision, a division of the court of appeals agreed, holding as a matter of first impression that a defendant may offer truthful evidence that may nevertheless mislead the jury without opening the door to constitutionally inadmissible evidence. *Johnson*, ¶ 1.

¶10 The division majority primarily based its reasoning on the holdings from two United States Supreme Court cases: *Walder v. United States*, 347 U.S. 62, 65 (1954) (recognizing the impeachment exception to the exclusionary rule by holding that evidence unconstitutionally seized under the Fourth Amendment is admissible to impeach a defendant's untruthful testimony), and *James v. Illinois*, 493 U.S. 307, 320 (1990) (holding that illegally obtained evidence may not be used to impeach a defense witness's testimony). *Johnson*, ¶¶ 17–25. Applying these holdings, the majority determined that the impeachment exception "cannot possibly permit the use of [suppressed] evidence to counter *truthful* testimony." *Id.* at ¶ 27. The majority held that the trial court erred in its CRE 403 ruling because "the effect of [that] ruling was to chill Johnson's presentation of truthful and favorable evidence." *Id.* at ¶ 27. And because Carrethers's GSR test results could support an inference that she fired a gun around the time that Griego was killed,

5

thus furthering Johnson's alternate suspect theory, the majority concluded that the error was not harmless beyond a reasonable doubt. The division majority accordingly reversed Johnson's first degree murder conviction and remanded the case for a new trial. *Id.* at ¶¶ 31–32.

¶11 Judge Taubman dissented in relevant part, noting that he would have affirmed Johnson's conviction because, in his view, the isolated presentation of Carrethers's GSR evidence would have prompted the jury to believe something that both parties and the trial court knew was not true—that Johnson either was not tested, or tested negative, for GSR. *Id.* at ¶¶ 79, 84, 89 (Taubman, J., concurring in part and dissenting in part). Thus, according to Judge Taubman, "the court's truth-seeking function tilts the scale toward permitting the prosecution to introduce [Johnson's] GSR evidence that had been previously excluded by the trial court to avoid misleading the jury." *Id.* at ¶ 79. Judge Taubman concluded that the trial court's CRE 403 ruling did not deprive Johnson of his right to exclude unconstitutionally seized evidence or his right to present a complete defense. *Id.* at ¶ 84. Rather, the trial court's ruling presented Johnson with a permissible, albeit difficult, tactical decision that defendants often face when determining how to best present a defense. *Id.* at ¶ 82.

¶12 We granted certiorari and now affirm the judgment of the court of appeals.

6

## II. Analysis

¶13    We begin by outlining the controlling standards of review.  We then detail the applicable law concerning the impeachment exception to the exclusionary rule.  Finally, we apply those principles to the facts presented here.

¶14    Like the division majority in this case, we draw guidance from *Walder*, *James*, and other relevant caselaw, as well as the United States and Colorado Constitutions, and conclude that a defendant may offer truthful, albeit potentially incomplete, evidence without opening the door to previously suppressed evidence.  This is because the important truth-seeking rationale that prohibits a defendant from turning the exclusion of illegally obtained evidence into a shield for perjury does not apply with equal force to truthful but potentially misleading testimony.  Accordingly, we affirm the judgment of the court of appeals.

### A.  Standards of Review

¶15    We review a trial court's interpretation of the law governing the admissibility of evidence de novo.  *People v. Salas*, 2017 COA 63, ¶ 30, 405 P.3d 446, 453; *see People v. Smith*, 40 P.3d 1287, 1290 (Colo. 2002) (stating that a trial court's application of legal standards in a suppression ruling is a question of law that we review de novo).  This review encompasses the broader legal question of whether a defendant *can* open the door for the admission of evidence otherwise barred by the exclusionary rule.  *See People v. Melillo*, 25 P.3d 769, 777 (Colo. 2001).

¶16    However, we review a trial court's determination of whether a party opened the door to otherwise inadmissible evidence for an abuse of discretion. *People v. Lesney*, 855 P.2d 1364, 1366–67 (Colo. 1993). A trial court abuses its discretion when its ruling is manifestly arbitrary, unreasonable, or unfair, *People v. Campbell*, 2019 CO 66, ¶ 21, 443 P.3d 72, 76, or when it misapplies the law, *People v. Jefferson*, 2017 CO 35, ¶ 25, 393 P.3d 493, 499.

¶17    If we conclude that the trial court erred in its evidentiary ruling, we must then determine whether such error necessitates reversal of Johnson's conviction. *Hagos v. People*, 2012 CO 63, ¶ 9, 288 P.3d 116, 118. Because Johnson preserved this issue through a contemporaneous objection, and because the issue implicates Johnson's Sixth Amendment right to present a complete defense, we review for constitutional harmless error. *Id.* at ¶ 11, 288 P.3d at 119; s*ee Krutsinger v. People*, 219 P.3d 1054, 1061 (Colo. 2009) (discussing a defendant's right to present a complete defense). Under that standard, "errors require reversal unless the reviewing court is 'able to declare a belief that [the error] was harmless beyond a reasonable doubt.'" *Hagos*, ¶ 11, 288 P.3d at 119 (quoting *Chapman v. California*, 386 U.S. 18, 24 (1967)). That is, we must reverse if "there is a reasonable possibility that the [error] might have contributed to the conviction." *Chapman*, 386 U.S. at 23 (quoting *Fahy v. Connecticut*, 375 U.S. 85, 86–87 (1963)). The State bears the burden

8

of proving that the error was harmless beyond a reasonable doubt. *Hagos*, ¶ 11, 288 P.3d at 119.

¶18 With these standards in mind, we turn to the applicable law.

## B. The Impeachment Exception to the Exclusionary Rule

¶19 The Fourth Amendment to the United States Constitution and article II, section 7 of the Colorado Constitution protect against "unreasonable searches and seizures." However, because the Fourth Amendment is silent regarding how this right is to be enforced, the Supreme Court adopted the "exclusionary rule," which serves as a "deterrent sanction that bars the prosecution from introducing evidence obtained by way of a Fourth Amendment violation." *Davis v. United States*, 564 U.S. 229, 231–32 (2011); *see Mapp v. Ohio*, 367 U.S. 643, 660 (1961). The exclusionary rule's purpose is to deter future Fourth Amendment violations "by removing the incentive to disregard" the Amendment's constitutional guarantee. *Elkins v. United States*, 364 U.S. 206, 217 (1960).

¶20 Because the exclusionary rule bars the prosecution from introducing evidence obtained through a Fourth Amendment violation, there is tension between the Fourth Amendment rights the exclusionary rule protects and the future search and seizure violations it seeks to deter, on the one hand, and the courts' truth-seeking function, on the other. *See United States v. Havens*, 446 U.S. 620, 626 (1980) ("There is no gainsaying that arriving at the truth is a fundamental

9

goal of our legal system."); *Davis*, 564 U.S. at 237 (discussing the social costs generated by the exclusionary rule, including that its "bottom-line effect, in many cases, is to suppress the truth"); *see also James*, 493 U.S. at 311–12 (explaining that the Court has "carved out exceptions to the exclusionary rule . . . where the introduction of reliable and probative evidence would significantly further the truthseeking function of a criminal trial and the likelihood that admissibility of such evidence would encourage police misconduct is but a 'speculative possibility'" (quoting *Harris v. New York*, 401 U.S. 222, 225 (1971))).

¶21 It is that tension that led the Supreme Court to adopt the impeachment exception in *Walder*. During his direct examination in a narcotics distribution case, the defendant testified untruthfully that he had never sold or possessed narcotics. *Walder*, 347 U.S. at 63. On cross-examination, the prosecutor asked the defendant about a prior drug possession charge, despite the fact that the charge was ultimately dismissed after evidence of the defendant's heroin possession was suppressed. In response, the defendant untruthfully testified that the prior case never happened. *Id.* at 64. The trial court then permitted the prosecution to impeach the defendant's credibility by presenting testimony from one of the officers who conducted the unlawful search in the prior possession case and the chemist who analyzed the heroin. *Id.* The defendant was ultimately convicted of distributing narcotics. *Id.*

¶22    The defendant appealed, asserting that the admission of the previously suppressed evidence violated his Fourth Amendment right to be free from unreasonable searches and seizures. *Id.* The *Walder* Court disagreed, noting,

> It is one thing to say that the Government cannot make an affirmative use of evidence unlawfully obtained. It is quite another to say that the defendant can turn the illegal method by which evidence in the Government's possession was obtained to his own advantage, and provide himself with a shield against contradiction of his untruths. Such [practice] would be a perversion of the Fourth Amendment.

*Id.* at 65. The Court held that the protection of the defendant's Fourth Amendment right did not provide "justification for letting the defendant affirmatively resort to perjurious testimony in reliance on the Government's disability to challenge his credibility." *Id.*

¶23    The Supreme Court revisited the impeachment exception in *Havens*. After stressing the "importance of arriving at the truth in criminal trials, as well as the defendant's obligation to speak the truth in response to proper questions," *Havens*, 446 U.S. at 626, the Court held that "a defendant's statements made in response to proper cross-examination reasonably suggested by the defendant's direct examination are subject to otherwise proper impeachment by the government, albeit by evidence that has been illegally obtained and that is inadmissible on the government's direct case, or otherwise, as substantive evidence of guilt," *id.* at 627–28.

11

¶24 While *Havens* undoubtedly expanded the scope of the impeachment exception, the question became how far? In other words, to what degree must a defendant "reasonably suggest" an untruth in his or her direct examination before it may be contradicted by the prosecution with suppressed evidence? We answered that question in *LeMasters v. People*, 678 P.2d 538 (Colo. 1984).

¶25 In *LeMasters*, the prosecution argued that the defendant opened the door to the admission of certain suppressed evidence for impeachment purposes "*because on the direct examination by the defendant there has been a denial of his involvement in this crime.*" *Id.* at 541. The trial court permitted the prosecution to introduce and inquire into certain physical evidence that was previously suppressed. *Id.* at 541–42.

¶26 On appeal, we overturned the defendant's conviction because "the requisite inconsistency between the suppressed physical evidence and the defendant's statement is not present." *Id.* at 543. Specifically, we observed,

> In our view, the United States Supreme Court did not intend that its decisions in *Walder* and its progeny be extended to the extreme asserted in this case. To [permit the prosecution to introduce the suppressed evidence] under the facts of this case would substantially burden a defendant's right to take the stand in his own defense by sanctioning the use of unconstitutionally obtained evidence to establish guilt.

*Id.* at 544. Our decision in *LeMasters* makes it clear that the impeachment exception to the exclusionary rule permits the prosecution to admit previously suppressed

12

evidence on cross-examination to impeach a defendant's untruthful testimony on direct examination, but only when there is an apparent nexus between the defendant's testimony and the suppressed evidence that contradicts the untruthful testimony.

¶27 Finally, in *James*, the United States Supreme Court addressed whether the impeachment exception allowed the use of suppressed evidence to impeach the testimony of defense witnesses in order to deter the defendant from engaging in perjury "by proxy." 493 U.S. at 311. The Court concluded that the impeachment exception does not permit the prosecution to introduce illegally obtained evidence to impeach the credibility of a defense witness. *Id.* at 320. The Court explained that "[e]xpanding the class of impeachable witnesses from the defendant alone . . . would not promote the truthseeking function to the same extent as did creation of the original exception, and yet it would significantly undermine the deterrent effect of the general exclusionary rule" for two reasons. *Id.* at 313–14. First, "the mere threat of a subsequent criminal prosecution for perjury is far more likely to deter a witness from intentionally lying on a defendant's behalf than to deter a defendant, already facing conviction for the underlying offense, from lying on his own behalf." *Id.* at 314. Second, because "[d]efendants might reasonably fear that one or more of their witnesses, in a position to offer truthful and favorable testimony, would also make some statement in sufficient tension with the tainted

13

evidence to allow the prosecutor to introduce that evidence for impeachment," *id.* at 315, expanding the impeachment exception to all defense witnesses "likely would chill some defendants from presenting their best defense and sometimes any defense at all—through the testimony of others," *id.* at 314–15.

¶28 The Court additionally explained that the exception "leaves defendants free to testify truthfully on their own behalf; they can offer probative and exculpatory evidence to the jury without opening the door to impeachment by carefully avoiding any statements that directly contradict the suppressed evidence. The exception thus generally discourages perjured testimony without discouraging truthful testimony." *Id.* at 314.

## C. Application

¶29 This case requires us to resolve the tension among the deterrent purpose animating the exclusionary rule, Johnson's right to present a complete defense, and the court's truth-seeking function. The trial court, applying CRE 403, concluded that the admission of Carrethers's positive GSR test results was misleading because it could imply that Johnson did not test positive for GSR or that he was not tested and the investigation was "subpar." Thus, if Johnson introduced such evidence, it would open the door for the prosecution to admit his previously suppressed positive GSR test results.

14

¶30 Judge Taubman concluded that the trial court's ruling was correct because Johnson sought to use his suppressed GSR evidence to "obfuscate the court's truth-seeking function." *Johnson*, ¶ 73 (Taubman, J., concurring in part and dissenting in part). The People ask, for the same reason, that we expand the impeachment exception to the exclusionary rule to reach truthful testimony elicited by the defense that could mislead the jury. For the reasons detailed below, we decline to expand the impeachment exception to truthful testimony.

¶31 The Supreme Court outlined the contours of the impeachment exception in *Walder* and *James*. While the facts presented here do not perfectly align with those of *Walder* or *James*, the relevant language from those cases convince us that the division majority got it right: "[T]he [impeachment] exception cannot possibly permit the use of [suppressed] evidence to counter *truthful* testimony." *Johnson*, ¶ 27. We reach this conclusion because the expansion of the impeachment exception sought by the People would undermine the purpose of the exclusionary rule and chill defendants' rights to present a complete defense through truthful testimony.

¶32 Permitting the prosecution to introduce Johnson's GSR evidence could undermine the exclusionary rule's "sole purpose," which is "to deter future Fourth Amendment violations." *Davis*, 564 U.S. at 236–37. As the division majority observed, such practice would "arguably encourage[] future violations" by

15

"effectively shield[ing] potentially exculpatory evidence from use by the defense." *Johnson*, ¶ 28. If we expand the impeachment exception to include a defendant's truthful testimony, the expected value of illegally obtained evidence would be enhanced, and an uptick in police misconduct may occur. *See James*, 493 U.S. at 318 (explaining that it is "far more than a 'speculative possibility' that police misconduct will be encouraged by permitting such use of illegally obtained evidence" because "police officers and their superiors would recognize that obtaining evidence through illegal means stacks the deck heavily in the prosecution's favor" (quoting *Harris*, 401 U.S. at 225)).

¶33 More significantly, expanding the impeachment exception to encompass defendants' truthful testimony "likely would chill some defendants from presenting their best defense and sometimes any defense at all." *Id.* at 314–15. That is precisely what occurred here. In effect, the trial court, through its CRE 403 ruling, expanded the impeachment exception to preclude Johnson from presenting truthful testimony that supported his alternate suspect theory. And in so doing, Johnson's constitutional right to present a complete defense was violated. *See Walder*, 347 U.S. at 65 ("[T]he Constitution guarantees a defendant the fullest opportunity to meet the accusation against him. He must be free to deny all the elements of the case against him without thereby giving leave to the Government to introduce by way of rebuttal evidence illegally secured by it . . . .").

16

¶34    Moreover, Carrethers's positive GSR test results would have been admitted not through Johnson or another defense witness, but rather through two of the prosecution's witnesses. And if the fear of "perjury by proxy" is insufficient grounds to expand the impeachment exception to a defense witness who ostensibly has an incentive to lie on behalf of the defendant, *James,* 493 U.S. at 310, 314, there is absolutely no reason to expand the exception to reach truthful testimony elicited by the defense through the prosecution's witnesses.

¶35    The trial court's and Judge Taubman's concerns regarding the courts' truth-seeking function are laudable. We affirm the importance of that principle here by emphasizing that it would not be proper for Johnson to ask the jury to infer that he was not tested for GSR, that he did not test positive for GSR, or that the investigation into Griego's death was subpar based on the GSR testing. However, there is no indication that Johnson planned to do so. Rather, defense counsel expressly stated to the trial court that he would avoid asking any questions involving Johnson's GSR evidence or the nature of the investigation, thereby diminishing the concern that the court's truth-seeking function would be undermined by the introduction of Carrethers's positive GSR test results. Under these circumstances, we agree with the division majority that the "effect of the trial court's ruling was to chill Johnson's presentation of truthful and favorable evidence," *id.* at ¶ 27, by "expand[ing] the impeachment exception even further

17

than . . . [the rejected expansion] in *James*," *id.* at ¶ 26. The court's evidentiary ruling under CRE 403 presented Johnson with the quintessential *Hobson's* choice: he could either rely on the trial court's ruling excluding his unconstitutionally seized GSR evidence at trial, or he could protect his right to present a complete defense, by introducing Carrethers's GSR test results, which supported his alternate suspect theory. Johnson could not do both. By forcing Johnson to make this choice, the trial court necessarily violated Johnson's right to present a complete defense.

¶36 We, accordingly, agree with the division majority and conclude that the trial court abused its discretion. *See Jefferson*, ¶ 25, 393 P.3d at 499.

¶37 Having found that the trial court erred, we will reverse if "there is a reasonable possibility that the [error] might have contributed to the conviction." *Chapman*, 386 U.S. at 23 (quoting *Fahy*, 375 U.S. at 86–87). As we alluded to above, the error might have contributed to Johnson's first degree murder conviction because it prevented him from presenting a complete defense, which included advancing the theory that Carrethers killed Griego. In fact, the trial court's evidentiary ruling effectively barred Johnson from introducing the evidence that was most probative of this theory—Carrethers's positive GSR test results—and limited the arguments defense counsel could make in closing. Had Johnson been able to fully explore Carrethers's GSR evidence, the jury could have believed that

18

she fired a gun around the time of Griego's murder, and such belief could have supported an inference that Johnson was not responsible for the murder. Accordingly, the trial court's error was not harmless beyond a reasonable doubt. *See Hagos*, ¶ 9, 288 P.3d at 118.

### III. Conclusion

¶38 For the foregoing reasons, we affirm the judgment of the court of appeals.

**JUSTICE MÁRQUEZ** dissents.

JUSTICE MÁRQUEZ, dissenting.

¶39 I respectfully dissent. The majority effectively holds today that a defendant can exploit the exclusionary rule to present evidence to a jury in a manner that is affirmatively misleading. *See* Maj. op. ¶¶ 1, 14. It does so by allowing a defendant to introduce incomplete evidence without opening the door to previously suppressed information that is necessary to contextualize such evidence and prevent the jury from drawing a false inference. The majority's ruling not only hinders the fundamental truthseeking function of trial but also allows a defendant to seek a verdict based in part on an inference that everyone in the courtroom, except the jury, knows to be untrue. Moreover, by inaccurately characterizing the suppressed evidence here as "impeachment," I believe both the court of appeals and the majority misapply *Walder v. United States*, 347 U.S. 62 (1954), and *James v. Illinois*, 493 U.S. 307 (1990).

¶40 Elmo Johnson sought to introduce evidence of Toni Carrethers's positive test results for gunshot residue ("GSR") to support an alternate suspect theory. But the value of this evidence to the defense lay in presenting it in isolation because doing so would give rise to an inference that Johnson did *not* test positive for GSR—an inference that the parties and the trial court knew was false. It does not matter that defense counsel pledged not to argue that inference or expressly ask the jury to draw it. The inference was natural, obvious, helpful to the

1

defense—and indisputably untrue. The trial court correctly recognized that, by presenting an incomplete picture of the GSR testing (that is, by introducing evidence that Carrethers tested positive for GSR knowing the jury was prevented from hearing about Johnson's suppressed GSR test results), Johnson sought to use the exclusionary rule both as a sword and a shield and to exploit the protection of that rule in a manner that undermined the truthseeking function of trial. To avoid misleading the jury, the trial court properly precluded Johnson from introducing evidence of Carrethers's GSR testing in isolation and instead conditioned his choice to introduce such evidence on allowing the prosecution to also introduce testimony regarding Johnson's GSR test results so that the jury would have a complete picture from which to draw any conclusions. In short, the trial court properly sought to prevent the jury from reaching a verdict based on an inference that the parties and the court knew to be false. In so doing, the trial court did not abuse its discretion or violate Johnson's constitutional rights.

¶41 Importantly, the trial court never characterized the suppressed evidence as "impeachment" evidence, nor did it purport to apply the specific impeachment exception to the exclusionary rule from *Walder* and *James*. This is because the suppressed evidence regarding Johnson's GSR testing would not somehow "impeach" or otherwise contradict testimony regarding Carrethers's GSR testing. Rather, allowing the defense to introduce evidence of Carrethers's results in

2

isolation created an incomplete and misleading picture—presenting an "opening-the-door" or doctrine of completeness problem, not an impeachment issue. For this reason, both the court of appeals' and the majority's reliance on the *Walder/James* impeachment analysis is inapt and makes little sense on these facts.

## I. *Walder/James*

¶42 The majority frames the issue here as whether the impeachment exception to the exclusionary rule from *Walder* and *James* should extend to the circumstances of this case. Because it asks the wrong question, the majority arrives at the wrong conclusion.

¶43 At the outset, I note two things. First, "[w]hile fundamental, the right to present defense evidence is not absolute." *People v. Melendez*, 102 P.3d 315, 320 (Colo. 2004). Indeed, "the right to present a defense is generally subject to, and constrained by, familiar and well-established limits on the admissibility of evidence." *People v. Elmarr*, 2015 CO 53, ¶ 27, 351 P.3d 431, 438. Second, under the Fourth Amendment, "[e]xclusion [of illegally obtained evidence] is 'not a personal constitutional right,' nor is it designed to 'redress the injury' occasioned by an unconstitutional search." *Davis v. United States*, 564 U.S. 229, 236 (2011) (quoting *Stone v. Powell*, 428 U.S. 465, 486 (1976)). Instead, the "sole purpose" of the exclusionary rule "is to deter future Fourth Amendment violations." *Id.* at 236–37.

3

¶44 As the majority correctly recognizes, the U.S. Supreme Court has "carved out exceptions to the exclusionary rule . . . where the introduction of reliable and probative evidence would significantly further the truthseeking function of a criminal trial and the likelihood that admissibility of such evidence would encourage police misconduct is but a 'speculative possibility.'" Maj. op. at ¶ 20 (quoting *James*, 493 U.S. at 311).

¶45 One such exception to the rule—recognized in *Walder* and *James*—"permits prosecutors to introduce illegally obtained evidence *for the limited purpose of impeaching the credibility of the defendant's own testimony*." *James*, 493 U.S. at 312, 320 (emphasis added) (holding that the impeachment exception to the exclusionary rule would not be expanded to permit the prosecution to use illegally obtained evidence to impeach the testimony of defense witnesses other than the defendant); *see also Walder*, 347 U.S. at 65–66 (holding that the prosecution could impeach a defendant's credibility using suppressed evidence of unlawfully seized heroin where a defendant asserted that he never possessed any narcotics).

¶46 The majority reasons that this "impeachment exception" does not apply to the facts here. Maj. op. ¶ 31. Of course it doesn't—because the suppressed evidence here is not impeachment evidence. *See People v. Johnson*, 183 Cal. App. 4th 253, 283 (2010) ("*James* is inapposite here. The trial court did not authorize use of [the defendant's] confession to impeach a witness. Rather, the court considered

4

the confession in order to prevent [the defendant] from extrapolating a false argument from truthful testimony.").

¶47 "The *sine qua non* of impeaching a witness'[s] testimony is that the evidence *contradicts* his previous statements." *LeMasters v. People*, 678 P.2d 538, 543 (Colo. 1984) (emphasis added). Here, evidence of Johnson's positive GSR results would not have *contradicted* truthful witness testimony regarding Carrethers's positive GSR results. Nor would it have contradicted any testimony by Johnson himself, untruthful or not. In short, the suppressed evidence is not "impeachment" evidence, and the majority's treatment of it as such leads it to miss the broader point of *Walder* and *James* and the case law on which they are founded.

¶48 That broader point is this: A defendant may not use the exclusionary rule as both a shield and a sword. While the exclusionary rule serves a deterrent function by requiring illegally obtained evidence to be suppressed in a prosecution's case-in-chief, the protection it offers a defendant must give way when the defendant seeks to exploit the rule to frustrate or undermine the truthseeking function of a criminal trial. As the U.S. Supreme Court has explained:

> It is one thing to say that the Government cannot make an affirmative use of evidence unlawfully obtained. It is quite another to say that the defendant can turn the illegal method by which evidence in the Government's possession was obtained to his own advantage, and provide himself with a shield against contradiction of his untruths. Such an extension . . . would be a perversion of the Fourth Amendment.

5

*Walder*, 347 U.S. at 65.

¶49    Ultimately, courts must balance the deterrent effect of the exclusionary rule with "the costs of withholding reliable information from the truth-seeking process." *Illinois v. Krull*, 480 U.S. 340, 347 (1987). Where, as here, a defendant seeks to introduce evidence that invites a jury to draw an indisputably false inference—specifically, a false inference that relies on the continued suppression of the illegally obtained evidence—the protection of the exclusionary rule must yield to the truthseeking goals of our legal system.

## II.  The Trial Court Did Not Abuse Its Discretion

### A.  The Trial Court's Ruling was Consistent with the Doctrine of Completeness

¶50    The trial court did not abuse its discretion under the circumstances of this case. Under the concept of "opening the door," this court has admitted evidence to "prevent [the defendant or the prosecution] in a criminal trial from gaining and maintaining an unfair advantage by the selective presentation of facts that, without being elaborated [upon] or placed in context, create an incorrect or misleading impression." *Golob v. People*, 180 P.3d 1006, 1012 (Colo. 2008) (holding that the trial court erred in limiting the scope of the defense expert's testimony because he should have been allowed to contextualize the prosecution expert's testimony that their conclusions were consistent); *People v. Miller*, 890 P.2d 84, 98–99 (Colo. 1995) (allowing the prosecution to introduce other crimes evidence

6

where defense counsel had "questioned [a witness] in a manner that took selective advantage of evidence regarding [the witness's] relationship with [the defendant] and sought to exclude the inadmissible [other crimes] evidence that would place that relationship in its proper context"); *see also People v. Sams*, 685 P.2d 157, 164 (Colo. 1984) ("[O]nce the defendant opens the door by eliciting testimony about . . . suppressed identifications, the prosecution should not be foreclosed from eliciting additional testimony about these same procedures.").

¶51 Similarly, the doctrine of completeness, codified in part in CRE 106, favors admission of evidence that contextualizes incomplete information that would otherwise be misleading to the jury. *See People v. Manyik*, 2016 COA 42, ¶ 85, 383 P.3d 77, 91 ("If admitting only one part of a written or recorded statement would be unfair or misleading, the rule of completeness favors admission of other parts of the statement."); *see also United States v. Lopez-Medina*, 596 F.3d 716, 735 (10th Cir. 2010) (holding that the purpose of the identical federal version of the rule "is to prevent a party from misleading the jury by allowing into the record relevant portions of [evidence] which clarify or explain the part already received" (quoting *United States v. Moussaoui*, 382 F.3d 453, 481 (4th Cir. 2004))).

¶52 Under the identical federal version of the rule, *see* Fed. R. Evid. 106, federal courts have admitted otherwise inadmissible evidence to correct a false impression created by incomplete testimony even where counsel did not

affirmatively make a false argument. For example, in *United States v. Womochil*, 778 F.2d 1311, 1315 (8th Cir. 1985), a witness testified out of the presence of the jury that the defendant's alleged co-conspirator obtained cocaine from the defendant and another individual, Gilbert. On cross-examination, however, defense counsel asked the witness if he obtained cocaine from Gilbert, leaving the false impression that the witness obtained cocaine only from Gilbert. *Id.* Although defense counsel did not expressly argue that the witness did not obtain cocaine from the defendant, the U.S. Court of Appeals for the Eighth Circuit held that the prosecution was properly allowed on redirect to correct this false impression by introducing the co-conspirator's complete statement that he obtained cocaine from both Gilbert *and* the defendant. *Id.*; *see also Gov't. of V.I. v. Archibald*, 987 F.2d 180, 188 (3d Cir. 1993) (noting that *Womochil* involved the "principle of completeness").

¶53 Here, the trial court's ruling properly recognized that Johnson's effort to introduce evidence of Carrethers's GSR test results would "open the door" to evidence of GSR testing and, under the doctrine of completeness, would require the jury to also hear evidence of Johnson's own test results. In its initial order, the court ruled that it would "not permit inquiry by [Johnson] that elicits the fact that Toni Carrethers was positive for gunshot residue which also then *misleads the jury* into believing either [Johnson] was never tested for gunshot residue or he was not positive for gunshot residue." (Emphasis added.) Later, when ruling on the

8

motion in limine regarding the same evidence, the court further explained that the jury would be left with the notion that only Carrethers, and not Johnson, was in an environment where a gun was fired, which is "flat out contrary to what the true evidence is" and is "tantamount to just being a *half[-]truth*" that "is completely misleading to the jury under the facts of this particular case." (Emphasis added.) The trial court thus properly concluded that the "jurors best get at the truth if they either hear that [Carrethers], [Johnson,] and [the victim's] mother were all positive and in an environment where a gun was fired or none of it." The court's ruling was consistent with the purposes of the doctrine of completeness.[1]

## B. The Trial Court's Ruling Is Consistent with CRE 403

¶54    The trial court's ruling is also consistent with CRE 403. It found "on a [CRE] 403 analysis [that] not to permit the People to rebut [Carrethers's positive GSR test results] with the true facts [that Johnson also tested positively] would be completely misleading to the jury." It thus ruled that if Johnson introduced

---

[1] Importantly, to determine whether evidence must be admitted under the rule of completeness, a "district court considers whether (1) it explains the admitted evidence, (2) places the admitted evidence in context, (3) *avoids misleading the jury*, and (4) insures fair and impartial understanding of the evidence." *United States v. Li*, 55 F.3d 325, 330 (7th Cir. 1995) (emphasis added). In other words, it is not enough that the introduced evidence is merely incomplete; the evidence must also have been introduced without the context necessary to avoid misleading the jury.

Carrethers's positive GSR test results, the prosecution could also reveal Johnson's positive GSR test results. In so doing, the court did not abuse its discretion.

¶55 CRE 403 allows relevant evidence to be excluded "if its probative value is substantially outweighed by the danger of unfair prejudice, confusion of the issues, or *misleading the jury*." (Emphasis added.)

¶56 Here, the jury was already aware that Carrethers had handled the shell casings. Thus, the probative value of evidence that Carrethers tested positive for GSR is arguably minimal. However, introducing that evidence in isolation without informing the jury about Johnson's results also would have been affirmatively misleading because it invited the jury to draw the false inference that Johnson either tested negatively for GSR or was not tested at all (perhaps due to a "subpar" investigation). The trial court therefore did not abuse its discretion when it concluded that the minimal probative value of introducing Carrethers's GSR results in isolation was substantially outweighed by the risk of misleading the jury. *See United States v. Morel*, 751 F. Supp. 2d 423, 431 (E.D.N.Y. 2010) (holding that, under the identical Fed. R. Evid. 403, a defendant could not reference the fact that the government initially declined to prosecute him because, without also introducing the constitutionally suppressed confession that caused the prosecution to change its mind, it would create a substantial risk of misleading the

10

jury into thinking that the prosecution charged the defendant for improper reasons).

¶57    Federal courts have observed the interplay between Rule 403 and the rule of completeness, explaining that Rule 403 can also be used to rectify the unfairness that the rule of completeness aims to prevent.  One court explained that Rule 403

> should not be overlooked when considering the implications of the rule of completeness . . . .  If[, for example,] allowing a government witness to testify only to a defendant's inculpatory statements, without being subject to cross[-]examination about the exculpatory portions of the same statement (because they are not independently admissible) would leave the jury with a misleading understanding of the defendant's statement to the extent that it would cause unfair prejudice, the court may give the government a choice: either allow cross[-]examination to provide a complete picture of what the defendant said; or exclude the testimony of the incomplete portion of the statement.

*United States v. Bailey*, 322 F. Supp. 3d 661, 673 (D. Md. 2017).  That choice is similar to the one the trial court provided Johnson here: either allow the prosecution to provide a complete picture of the GSR results or exclude the incomplete GSR results.  In other words, the trial court concluded that the jury could hear all of the GSR evidence, or none of it, but Johnson could not mislead the jury by introducing only evidence of Carrethers's GSR results.[2]

---

[2] The trial court's concern was well-founded.  The jury in fact submitted questions following Detective Mark Yacano's testimony asking whether Johnson, his hands,

11

¶58     The trial court was in the best position to assess the potential prejudicial impact of this evidence. *Wend v. People*, 235 P.3d 1089, 1097 (Colo 2010); *see also People v. Gibbens*, 905 P.2d 604, 607 (Colo. 1995) ("Under CRE 403, trial courts are given broad discretion in balancing the probative value of the evidence against the danger of unfair prejudice."). It did not abuse its broad discretion when it concluded that the introduction of Carrethers's GSR results, in isolation, would mislead the jury in violation of CRE 403, and thus properly conditioned the introduction of that evidence on the admission of Johnson's GSR results.

## III. The Trial Court's Ruling Did Not Violate Johnson's Constitutional Rights

¶59     The trial court's ruling did not violate Johnson's constitutional rights. As noted above, the "[e]xclusion [of illegally obtained evidence] is 'not a personal constitutional right,' nor is it designed to 'redress the injury' occasioned by an unconstitutional search." *Davis*, 564 U.S. at 236 (quoting *Stone*, 428 U.S. at 486). Instead, the "sole purpose" of the rule "is to *deter* future Fourth Amendment violations." *Id.* at 236–37 (emphasis added). Accordingly, if a defendant has no constitutional right to the exclusion of evidence, a defendant certainly has no

---

or his clothing were tested for GSR and, if so, what were the results. Given the court's ruling, the parties agreed that neither question should be asked.

12

constitutional right to thwart the trial court's truthseeking function by using the exclusionary rule as both a sword and a shield.

¶60 Notably, courts prevent defendants from using the Fifth Amendment as both a sword and shield, even where their express constitutional privilege to avoid self-incrimination is implicated. *See United States v. $133,420.00 in U.S. Currency*, 672 F.3d 629, 640 (9th Cir. 2012); *United States v. $148,840.00 in U.S. Currency*, 521 F.3d 1268, 1277 (10th Cir. 2008) ("[A] district court may strike conclusory testimony if the witness asserts the Fifth Amendment privilege to avoid answering relevant questions, yet freely responds to questions that are advantageous to his cause. This doctrine exists to prevent a party from converting the Fifth Amendment privilege from its intended use as a shield against compulsory self-incrimination into an offensive sword." (citations omitted)).

¶61 Courts prevent this dual use "to protect the integrity and truth-seeking function of the judicial system," and do so by "preventing [a] witness from using the privilege to 'mutilate the truth a party offers to tell.'" *$133,420.00*, 672 F.3d at 640–41 (quoting *Lawson v. Murray*, 837 F.2d 653, 656 (4th Cir. 1988)). Given that defendants may not use their express Fifth Amendment constitutional privilege as both a sword and a shield, surely they may not exploit a judicially created rule to similarly thwart the truthseeking process of a criminal trial.

13

¶62    The trial court's ruling likewise did not infringe on Johnson's Sixth Amendment guarantee of "a meaningful opportunity to present a complete defense." *Holmes v. South Carolina*, 547 U.S. 319, 324 (2006) (quoting *Crane v. Kentucky*, 476 U.S. 683, 690 (1986)). A defendant is deprived of this right only if he is denied "virtually his only means of effectively testing significant prosecution evidence." *Krutsinger v. People*, 219 P.3d 1054, 1062 (Colo. 2009).

¶63    A trial court may exclude defense evidence without infringing a defendant's Sixth Amendment rights, so long as the exclusion serves a legitimate purpose and is proportionate to the ends it is asserted to promote. *Holmes*, 547 U.S. at 326. Notably, the U.S. Supreme Court in *Holmes* concluded that "well-established rules of evidence permit trial judges to exclude evidence if its probative value is outweighed by . . . [the] potential to mislead the jury." *Id.* This court similarly has held that the right to present a defense is limited by evidentiary rules and that "even relevant alternate suspect evidence may be excluded if its probative value is substantially outweighed by . . . the danger of . . . misleading the jury." *Elmarr*, ¶ 25, 351 P.3d at 438.

¶64    Here, the trial court did not actually preclude Johnson from introducing Carrethers's GSR test results; it merely warned him that if he introduced it in a manner that would mislead the jury, the prosecution would be allowed to introduce Johnson's own GSR test results. Johnson has no constitutional right to

14

present evidence in an incomplete and misleading manner. Thus, he merely faced a difficult strategic decision—whether the value of introducing Carrethers's GSR test results outweighed the admission of the otherwise excludable GSR evidence. *See People v. Skufca*, 176 P.3d 83, 88–89 (Colo. 2008) (noting that a "defendant may constitutionally be required to make difficult strategic choices" and deeming the decision of whether to risk self-incrimination by testifying about drug transactions introduced in the prosecution's case-in-chief a tactical choice, but not one implicating constitutional rights).[3] Finally, the choice Johnson faced did not prevent him from presenting an alternate suspect defense. Johnson presented evidence that Carrethers killed the victim because she was in the apartment when the victim was shot, had tampered with evidence, made several implausible statements about not investigating the gunshots, and left the next day without checking on Johnson or the victim. Accordingly, the trial court's ruling did not run afoul of Johnson's constitutional rights.

---

[3] Johnson contends that, because he had to choose between his right against illegal search and seizure and his right to present a defense, the trial court forced him to make a Hobson's choice involving "an intolerable tension between two constitutional rights." *See People v. Chavez*, 621 P.2d 1362, 1365 (Colo. 1981). However, as explained above, Johnson has no personal right under the Fourth Amendment to exclude illegally obtained evidence, and his Sixth Amendment right to present a complete defense was not violated. Therefore, he was not forced to choose between two constitutional rights.

## IV. Conclusion

¶65 "[A]rriving at the truth is a fundamental goal of our legal system." *James*, 493 U.S. at 311 (quoting *United States v. Havens*, 446 U.S. 620, 626 (1980)). And while the exclusionary rule is an example of a constitutional rule that limits the means by which the government may conduct this search for truth in order to promote other constitutional values, *see id.*, the U.S. Supreme Court has carved out exceptions to the exclusionary rule "where the introduction of reliable and probative evidence would significantly further the truthseeking function of a criminal trial and the likelihood that admissibility of such evidence would encourage police misconduct is but a 'speculative possibility,'" *id.* at 311–12 (quoting *Harris*, 401 U.S. at 225).

¶66 The majority holds today that "a defendant may offer truthful, albeit potentially incomplete, evidence without opening the door to previously suppressed evidence." Maj. op., ¶ 14. In so doing, the majority effectively allows defendants to exploit the exclusionary rule by introducing incomplete evidence to mislead a jury, knowing that the information necessary to contextualize such evidence will remain suppressed. I am concerned that the majority's ruling undermines our legal system's fundamental goal of arriving at the truth, *see Havens*, 446 U.S. at 626, by allowing a defendant to wield the exclusionary rule as both a shield and a sword in ways directly contrary to the principles animating

16

*James*, *Walder*, and the case law on which they rely. Accordingly, I respectfully dissent.