23CA1074 Peo v McKain 02-13-2025

COLORADO COURT OF APPEALS

Court of Appeals No. 23CA1074
El Paso County District Court No. 22CR5894
Honorable Erin Sokol, Judge

The People of the State of Colorado,

Plaintiff-Appellee,

v.

Matthew McKain,

Defendant-Appellant.

JUDGMENT AFFIRMED

Division VII
Opinion by JUDGE LIPINSKY
Johnson and Moultrie, JJ., concur

**NOT PUBLISHED PURSUANT TO C.A.R. 35(e)**
Announced February 13, 2025

Philip J. Weiser, Attorney General, Trina K. Kissel, Senior Assistant Attorney General & Assistant Solicitor General, Denver, Colorado, for Plaintiff-Appellee

Megan A. Ring, Colorado State Public Defender, Amanda Bishop, Deputy State Public Defender, Colorado Springs, Colorado, for Defendant-Appellant

¶ 1    Matthew McKain appeals his convictions for third degree assault and harassment.  We affirm.

## I.    Background

¶ 2    A jury could have reasonably found the following facts from the evidence introduced at trial.

¶ 3    McKain rented an upstairs room in a house in which four other people lived.  Lillie Graber and her partner lived in the basement.  McKain's landlord, Crystal James, also lived upstairs.

¶ 4    After returning home one night, McKain started banging on the basement door and "shouting profanities."  Graber went up the basement stairs with her cell phone to record her interaction with McKain.  McKain swung at Graber, knocking the phone out of her hand.  Graber's partner witnessed the interaction, which was recorded on Graber's phone, from the bottom of the basement stairs.

¶ 5    Graber testified that McKain "then thr[ew] [her] to the ground."  Graber's partner said he ran up the basement stairs and "jumped on [McKain's] back" to "restrain" him.  Graber then "ran upstairs to grab [James, the landlord]."  McKain and Graber's partner

"wrestl[ed] around" until Graber's partner could safely "r[u]n to [his basement] bedroom."

¶ 6    James testified that, while still in bed, she heard "yelling, screaming, banging, [and] stomping around" immediately after hearing McKain come through the front door. She then heard "a really loud crack and bang." James got out of bed to "see what was happening." As James was preparing to head downstairs, she heard Graber "screaming, '[James], help us. [James], help us.'" James called 911.

¶ 7    Sergeant Vincent Sapp and Deputy Brent Yelton (the officers) of the El Paso County Sheriff's Department (the Department) responded to James's 911 call. The officers saw overturned items in the kitchen and a hole in the basement door. They spoke to McKain and other residents of the house. The officers did not arrest McKain but gave him a summons to appear in court. When the officers asked McKain to sign the summons, he refused and used "very foul language." He called them "different types of names" and used a "racial slur." Because the officers did not "want to press the issue," they marked "refuse[d] to sign" on the summons, left a copy for him, and departed from the house.

2

¶ 8    Graber testified that, after the officers left, McKain was "being very aggressive"; he "banged on [her] door[,] . . . jumped down the stairs, . . . [and] slammed his feet on the ground." Shortly after leaving the house, Deputy Yelton texted Graber to inform her of McKain's court date. Graber responded that McKain "ha[d] been assaulting [her]" since the officers left and sent Deputy Yelton a video depicting McKain's actions after the officers had left. Graber told Deputy Yelton that she was in fear of her life, could not get to her car, and wanted to go to a hospital.

¶ 9    The officers returned to the house and told McKain that he was under arrest. McKain tried to pull away as the officers attempted to handcuff him. With some difficulty, the officers handcuffed McKain and walked him toward their patrol car. When the officers told McKain to sit in the patrol car, he "put his foot on the side of the vehicle and pushed away." Deputy Yelton responded by swinging his right arm across the front of McKain's body and taking him "to the ground." McKain "landed on his stomach with [Deputy Yelton's] left leg under [McKain]." McKain "began to move around, and [Deputy Yelton's] knee twisted under [McKain]." Deputy Yelton shouted that McKain "ha[d] [his] leg," and Sergeant

3

Sapp yelled at McKain to "let go." McKain "did not comply, and [Sergeant Sapp] hit [McKain] twice in the face." McKain "rolled to his right side, and [Deputy Yelton] was able to pull [his] leg away." The officers took McKain into custody and booked him into the El Paso County Jail.

¶ 10 Graber suffered bruises and abrasions during her initial confrontation with McKain. In addition, James alleged that McKain had assaulted her.

¶ 11 McKain was initially charged in two separate cases with second degree assault on a peace officer (the second degree assault count), two counts of third degree assault concerning Graber and James, menacing and harassment relating to Graber, and resisting arrest.

¶ 12 As explained further below, during McKain's trial, the court dismissed the second degree assault and resisting arrest counts because defense counsel had not been provided with the use of force reports (the reports) concerning Sergeant Sapp's use of force against McKain. The jury found McKain guilty of harassment and third degree assault of Graber. It acquitted McKain of menacing Graber and third degree assault of James.

¶ 13    On appeal, McKain contends that the court erred by joining the two cases filed against him; not dismissing the entire case as a sanction for the prosecution's failure to provide defense counsel with the reports; not dismissing the case as a sanction for the prosecution's failure to provide defense counsel with the victims' medical reports and unedited photos of Graber's injuries; giving the jury an initial aggressor instruction and, after deciding to give such instruction, not giving McKain's proposed initial aggressor instruction; and not giving his proposed jury instructions on the First Amendment and implicit bias.  Lastly, McKain argues that we should reverse his conviction for cumulative error.

## II.    Analysis

### A.    The Court Acted Within Its Discretion by Joining McKain's Two Cases

#### 1.    Standard of Review

¶ 14    "We review a trial court's decision to consolidate separate charges under Crim. P. 13 for an abuse of discretion."  *Buell v. People*, 2019 CO 27, ¶ 14, 439 P.3d 857, 860.  "A trial court abuses its discretion when its ruling is manifestly arbitrary, unreasonable,

or unfair, or when it misapplies the law." *People v. Johnson*, 2021 CO 35, ¶ 16, 486 P.3d 1154, 1158 (citations omitted).

### 2. Controlling Law

¶ 15    Crim. P. 13 says,

> Subject to the provisions of Rule 14, the court may order two or more indictments, informations, complaints, or summons and complaints to be tried together if the offenses, and the defendants, if there are more than one, could have been joined in a single indictment, information, complaint, or summons and complaint.

"[C]onsolidation requires both that joinder would have been proper under Crim. P. 8(a)(2) and that the consolidation would not result in prejudice within the meaning of Crim. P. 14." *Buell*, ¶ 16, 439 P.3d at 860.

¶ 16    Crim. P. 8 governs mandatory and permissive joinder. Joinder is mandatory "if [several offenses] are based on the same act or series of acts arising from the same criminal episode." Crim. P. 8(a)(1). In contrast, joinder is permissive "if the offenses charged, whether felonies or misdemeanors or both, are of the same or similar character or are based on two or more acts or transactions

6

connected together or constituting parts of a common scheme or plan." Crim. P. 8(a)(2).

¶ 17    Crim. P. 14 provides that

> [i]f it appears that a defendant or the prosecution is prejudiced by a joinder of offenses or of defendants in any indictment or information, or by such joinder for trial together, the court may order an election or separate trials of counts, grant a severance of defendants, or provide whatever other relief justice requires.

### 3.    Procedural History

¶ 18    The prosecution initially charged McKain with third degree assault and harassment of Graber based on his actions that prompted James to call 911.  It also charged him with third degree assault of James in this case.  McKain was later charged in a separate case with menacing Graber, second degree assault on a peace officer, and resisting arrest.  The charges in that case arose from McKain's conduct that led the officers to return to the house in response to Graber's text message and his conduct toward the officers during his arrest.

¶ 19    The prosecution moved to consolidate the two cases under the mandatory joinder rule, Crim. P. 8(a)(1), on the grounds that the

"incident really constitute[d] one continuous sequence of events." Alternatively, the prosecution requested that the court permissively join the cases under Crim. P. 8(a)(2) because McKain was "alleged to assault [Graber], and it [was] his continued harassment of [Graber] that [led] to his arrest and the eventual assault of Deputy Yelton." The prosecution asserted that the assaults were "similar in character and seem[ed] to be part of a common scheme." McKain objected to consolidating the cases, arguing that they arose from "separate acts, with completely different characteristics."

¶ 20    The court granted the motion to consolidate. It found that joinder was mandatory because "the two cases [were] based on the same act or series of acts arising out of the same criminal episode." Alternatively, the court said that the joinder was permissive, as the cases involved "the same victims, the same police officers, the same address, and almost a continuous time frame separated by ten minutes . . . [a] continuous sequence of events."

### 4.    Permissive Joinder

¶ 21    McKain contends the court abused its discretion by joining the cases and that the joinder prejudiced him. We disagree.

¶ 22    McKain argues that joinder was improper because there was a "substantial temporal break in the two incidents," noting Sergeant Sapp's testimony that he and Deputy Yelton returned to the house "later in the night" following McKain's initial confrontation with Graber.  The record, however, does not support McKain's position.

¶ 23    McKain's fight with his housemates began shortly before 11 p.m.  In response to James's 911 call, the officers arrived, spoke to McKain's housemates, and issued a summons to McKain.  The evidence at trial showed that Deputy Yelton realized, within minutes of leaving the house, that he had forgotten to provide Graber with McKain's court date, which he texted to her.  He noted in his text message, "I just left your home."  Graber responded by asking the officers to return to the house because McKain was being aggressive and she wanted to drive herself to the hospital.  The officers returned and arrested McKain.

¶ 24    The evidence established that the respective acts underlying the two cases against McKain occurred in close sequence and involved the same dispute, the same location, and the same individuals and officers.  The officers returned to the house in close temporal proximity to their first visit.

¶ 25    Crim. P. 8(a)(2) "establishes three disjunctive bases" for permissive joinder: (1) whether the offenses are of the "same or similar character"; (2) whether they are "based on two or more acts or transactions connected together"; or (3) whether the acts "constitut[ed] parts of a common scheme or plan." *Buell*, ¶ 21, 439 P.3d at 861.  The meaning of "same or similar character" for purposes of Crim. P. 8(a)(2) "does not impose onerous restrictions on joinder." *Bondsteel v. People*, 2019 CO 26, ¶ 37, 439 P.3d 847, 853.

> In assessing whether two cases are of a "same or similar character," courts have considered factors such as the elements of the offenses at issue, the temporal proximity of the underlying acts, the likelihood that the evidence will overlap, the physical location of the acts, the modus operandi of the crimes, and the identity of the victims.

*Id.* at ¶ 38, 439 P.3d at 853.  These factors support the court's decision to consolidate the cases under Crim. P. 8(a)(2).

¶ 26    In addition, McKain fails to establish that joinder of the cases caused him "actual prejudice."

> The discretionary nature of a [Crim. P.] 14 decision creates a high bar for a defendant hoping for reversal.  The defendant bears the burden of demonstrating (1) "actual prejudice"

10

caused by the joinder and (2) "that the trier of fact was unable to separate the facts and legal principles applicable to each offense."

*Washington v. People*, 2024 CO 26, ¶ 37, 547 P.3d 1087, 1094 (quoting *Bondsteel*, ¶ 59, 439 P.3d at 856).

¶ 27    The record does not show that the jury was unable to separate the facts and legal principles applicable to each count against McKain, particularly as the court dismissed two of the counts stemming from the officers' second visit to the house — the second degree assault and resisting arrest counts — and the jury acquitted McKain of the third count arising from the second visit — menacing.  In addition, the jury acquitted McKain of assaulting James, one of the counts relating to the officers' first visit.  "These verdicts suggest to us that the jury carefully considered each count and did not blur together the facts and legal theories involved in each case but rather kept them separate."  *Bondsteel*, ¶ 62, 439 P.3d at 856-57.

¶ 28    McKain further argues that joinder of his cases prejudiced him because evidence of the counts relating to the officers' second visit to the house was inadmissible under CRE 404(b) at the portion of his trial concerning the events that led to the officers' first visit.  He

asserts that such evidence was inadmissible at that portion of the trial because it improperly "prove[d] [his] character in order to show" that, earlier in the night, he had "acted in conformity with the character." *See* CRE 404(b).

¶ 29    However, the jury never heard evidence that McKain resisted arrest or assaulted Deputy Yelton because, before the prosecution called its first witness, the court dismissed the counts relating to McKain's interaction with the officers. Accordingly, evidence of McKain's actions after the officers left the house following their first visit could not have prejudiced him at a trial of the counts relating to that first visit.

¶ 30    McKain also argues that his counsel would have allotted her voir dire time differently had evidence of McKain's interactions with the officers during their second visit not been part of the case. He asserts that, because defense counsel spent significant time questioning the jurors about their ability to be fair and impartial when a person is accused of assaulting a peace officer, defense counsel did not have time to speak with the jurors about "basic principles of law with respect to self-defense," implicit bias, and freedom of speech. However, McKain does not assert that the lack

12

of such voir dire resulted in the seating of a biased juror. *See Clark v. People*, 2024 CO 55, ¶ 42, 553 P.3d 215, 226 ("Absent bad faith, any such error that does not result in [a] biased juror actually participating on the jury is necessarily harmless.").

¶ 31    Further, McKain argues that, as a result of the joinder of the cases, his counsel focused on the second degree assault count during opening statements and the jury heard, early in the case, that McKain assaulted an officer. But defense counsel's references in her opening statement to the counts related to McKain's second interaction with the officers did not prejudice him because the court later instructed the jury not to consider those counts after the court dismissed them. McKain does not point to any evidence indicating that the jurors disregarded the instruction. "Absent evidence to the contrary, a jury is presumed to understand and follow the trial court's instructions." *People v. Chase*, 2013 COA 27, ¶ 37, 411 P.3d 740, 750.

¶ 32    Accordingly, the court's decision to consolidate the cases was not manifestly arbitrary, unreasonable, or unfair. Thus, we conclude that the court did not abuse its discretion by consolidating McKain's cases under Crim. P. 8(a)(2). And given our

disposition on permissive joinder, we need not consider whether the cases could also have been consolidated under the mandatory joinder rule.

### B. The Court Did Not Abuse Its Discretion by Dismissing Two Counts Rather than the Entire Case as a Sanction for the Prosecution's Untimely Disclosure of the Reports

#### 1. Standard of Review

¶ 33    "In the event that a discovery violation is found, the decision whether to impose a sanction is within the sound discretion of the trial court." *People v. Lee*, 18 P.3d 192, 196 (Colo. 2001).  If the court decides to impose a sanction, "[c]hoosing an appropriate sanction for discovery violations lies within the sound discretion of the trial court." *People v. Tippet*, 2023 CO 61, ¶ 34, 539 P.3d 547, 554.  "Because of the multiplicity of considerations involved and the uniqueness of each case, great deference is owed to trial courts in this regard, and therefore an order imposing a discovery sanction will not be disturbed on appeal unless it is manifestly arbitrary, unreasonable, or unfair." *Lee*, 18 P.3d at 196.

## 2. Additional Facts

¶ 34    The day before trial, McKain filed a motion for sanctions under Crim. P. 16 asserting, among other things, that the prosecution had failed to provide the defense with discovery concerning Sergeant Sapp's use of force, "even though he punched [McKain] in the face, with a closed fist, twice, while [McKain] was handcuffed."

¶ 35    Outside the jury's presence, the court questioned Otis Habert and Jason Hess, two lieutenants at the Department who the defense believed had knowledge of Sergeant Sapp's use of force against McKain. Lieutenant Habert testified that he was not Sergeant Sapp's supervisor and that he did not "specifically" recall whether Sergeant Sapp had told him about using force against McKain. Lieutenant Hess said that he was Sergeant Sapp's supervisor and that Sergeant Sapp had reported his use of force during McKain's arrest through the Department's "Blue Team reporting system." Lieutenant Hess said he had reviewed the report and found "[t]here were no policy violations or violations of state law." Lieutenant Hess added that his finding was reflected in the Department's tracking system.

¶ 36    After Lieutenant Hess testified, defense counsel moved to dismiss the case for outrageous government conduct, asserting that Sergeant Sapp had lied when he previously said he had reported his use of force to Lieutenant Habert.  Counsel said that the defense's investigator, Shaffer Kirschenmann, had requested "that exact record" from the Department but that no such records had been provided to the defense.

¶ 37    The court then questioned Kirschenmann about her requests for the reports.  Kirschenmann testified that she submitted requests to the Department under the Colorado Open Records Act (CORA) and the Colorado Criminal Justice Records Act (CCJRA) for documents relating to Sergeant Sapp's use of force against McKain, including "Blue Team reports," which the Department requires whenever an officer uses force.  Kirschenmann said that a records custodian for the Department told her there were no responsive documents.

¶ 38    After Kirschenmann testified, the court said it "definitely" found a Crim. P. 16 violation and that it had "real concerns about the fact that the investigator asked specifically for this [use of force] information, that Lieutenant Hess has that information, and . . . it

16

wasn't disclosed." The prosecution then asked for a continuance to "try and figure out where these reports [were] and how to get them." Defense counsel repeated her request that the case be dismissed and said that, if the court was not "inclined to dismiss the case," she would ask the court to dismiss the second degree assault count.

¶ 39     The court also questioned Chris Strider, an assistant county attorney and a legal advisor for the Department, about "the Blue Team system" that the Department used "to report use of force." Strider testified that "the Blue Team system or Blue Team recording process" is part of the Internal Affairs Division in the Department. He said that, "[t]o my knowledge, we did not receive a subpoena duces tecum [from the defense] for Blue Team or for an internal affairs file."

¶ 40     The court asked Strider what would have occurred "if a CCJRA request was made in this case and a CORA request." Strider responded:

> My understanding is that there was some sort of communication with . . . somebody from [Internal Affairs]. These don't all come to me for review, so I'm not exactly sure what was disclosed or what was requested, whether it

17

was conducted through the actual CCJRA or CORA form that is available to the public on the website. I'm not sure.

¶ 41    In response to Strider's testimony, the court asked Kirschenmann whether she had requested the use of force reports through CORA and the CCJRA. She explained that she first made an internal affairs request and later submitted "CORA and CCJRA" requests to the records department "after there were no responsive documents."

¶ 42    The court asked Strider to speak with Kirschenmann "to see what the request was and then" to "advise" it of the discussions. Strider responded that he preferred to "speak to the records department and get the request from them." The court proceeded with the trial while Strider looked into the status of Kirschenmann's requests for the reports.

¶ 43    Strider returned to the court later that day with the reports, which Sergeant Sapp and Deputy Yelton had drafted. In addition, Strider confirmed to the court that the defense had requested the reports but that a records custodian had told the defense that the reports did not exist.

¶ 44    Following Strider's testimony, the court asked the parties to examine the reports and determine whether their late disclosure prejudiced the defense.  The court said that the untimely disclosure was "not a [Crim. P.] 16 issue" because the prosecution was not "on notice that they were supposed to be going and getting" the reports, "but it may still be a discovery issue."

¶ 45    Later that day, the court said it had found material differences between the information in the reports and the information provided to the defense through discovery earlier in the case.  The court said, "This is a very different story about what may have happened here with respect to" the second degree assault count.

¶ 46    The court concluded that the untimely disclosure of the reports prejudiced the defense, saying to the prosecutors:

> [Y]ou haven't done anything wrong here.  You weren't even aware of this because there were no requests made to you.  But the fact that law enforcement didn't advise the Defense about these reports when they were requested and didn't even give the Defense the opportunity to challenge the custodial — the record — the custodian of records' decision, apparently, not to tell them about it or not to disclose these documents is truly problematic, extremely prejudicial on this charge.  And I'm looking for the least restrictive sanction.

19

¶ 47    Defense counsel requested that the court dismiss the second

degree assault count.  The court agreed, saying, "I think that

[dismissing the count] is the least restrictive sanction given the

circumstances.  I don't do that lightly by any stretch of the

imagination, but I have real concerns about what's happened here."

¶ 48    The court noted that the untimely disclosure of the use of

force reports prejudiced McKain because his counsel's "opening

statement didn't incorporate these changes and these differences"

between the information in the reports and the information in the

discovery previously provided to the defense.  As the court

explained, a continuance would not remedy the prejudice to the

defense because the failure to provide the reports "put[] the Defense

under an unnecessary and undue prejudice of trying to change

their entire cross-examination and accommodate these changes on

this short notice."

¶ 49    After the court announced it would dismiss the second degree

assault count, the prosecutor moved to dismiss the resisting arrest

count, as well, because it was "sort of part and parcel" of the second

degree assault count.  The court agreed and dismissed the resisting

arrest count.

¶ 50    The court instructed the jury that it had dismissed two of the counts and told the jury it would "no longer be considering the evidence with respect to those" counts.

### 3.    McKain Did Not "Abandon" His Request for Dismissal of the Entire Case

¶ 51    The People argue that McKain "abandoned" his "request that the entire case be dismissed" because the court granted his requested relief when it dismissed the second degree assault count. Although defense counsel asked the court to dismiss the second degree assault count after moving for dismissal of the case, and did not reiterate the request to dismiss the entire case when the court discussed possible sanctions, defense counsel's statement regarding dismissal of the single count was a direct response to the court's assertion that it was "looking for the least restrictive sanction."

¶ 52    The case law does not support the People's argument that McKain "abandoned" his request that the entire case be dismissed because his counsel had not reasserted that request after the court focused on the "least restrictive sanction." *See Forgette v. People*, 2023 CO 4, ¶¶ 25-35, 524 P.3d 1, 6-8 (holding that the defendant waived his objection to a sleeping juror by failing to request that the

21

court take any action after defense counsel brought the matter to the court's attention); *Richardson v. People*, 2020 CO 46, ¶¶ 26-30, 481 P.3d 1, 5-7 (holding that the defendant waived the right to challenge a juror on appeal because defense counsel knew the juror was the judge's wife but did not make any attempt to remove her from the jury); *Stackhouse v. People*, 2015 CO 48, ¶¶ 5-16, 386 P.3d 440, 442-46 (holding that the defendant waived his objection to closure of the courtroom by standing by silently when the court ordered closure). Accordingly, we conclude that McKain did not abandon his argument that the court erred by not dismissing the entire case as a sanction for the untimely disclosure of the reports.

### 4. The Sanction Was Appropriate

¶ 53 Although McKain did not abandon his request for outright dismissal of the case, we disagree with his contention that the court abused its discretion by limiting the sanction to the dismissal of the two counts affected by the untimely disclosure of the reports.

¶ 54 McKain argues that the prosecution violated Crim. P. 16 by not disclosing the reports. The People respond that there was no Crim. P. 16 violation because defense counsel was required to subpoena the reports from the Department's internal affairs

22

department and to make a sufficient showing under *People v. Spykstra*, 234 P.3d 662 (Colo. 2010), that the subpoena was not "unreasonable or oppressive." *People v. Cline*, 2022 COA 135, ¶¶ 22-28, 525 P.3d 303, 308-09.

¶ 55    The Colorado appellate courts have never decided whether the prosecution must provide the defense with use of force reports under Crim. P. 16's mandatory disclosure requirement when such reports are relevant to one of the charges pending against the defendant. *Cf. Solano v. Newman*, 2024 COA 93M, ¶¶ 31-33, 559 P.3d 259, 267-68 (citing out-of-state and federal authorities in support of its conclusion that a sheriff's department is deemed part of the prosecution team for purposes of assisting with the provision of mandatory disclosures under Crim. P. 16(a)). Even so, we do not need to resolve this question because the People do not contest that the Department's conduct was sanctionable. As a result, we need only review whether the court chose an appropriate sanction. We conclude that it did so.

¶ 56    "We may properly conclude that the trial court abused its discretion only if we can say with fair assurance that, based on the particular circumstances confronting the court, the decision [to

impose a specific sanction] was manifestly arbitrary, unreasonable, or unfair." *People v. Milton*, 732 P.2d 1199, 1207 (Colo. 1987). "In imposing discovery sanctions, the trial court must exercise its discretion 'with due regard for the purposes of the discovery rules themselves and the manner in which those purposes can be furthered by discovery sanctions.'" *Tippet*, ¶ 35, 539 P.3d at 554-55 (quoting *Lee*, 18 P.3d at 196).

¶ 57   The purpose of the discovery process is "to advance the search for truth." *People v. Dist. Ct.*, 793 P.2d 163, 168 (Colo. 1990). Discovery sanctions are intended to "protect[] the integrity of the truth-finding process and deter[] discovery-related misconduct." *Lee*, 18 P.3d at 196. In addressing a discovery violation, "the trial court must strike a balance by 'impos[ing] the least severe sanction that will ensure that there is full compliance with the court's discovery orders.'" *Tippet*, ¶ 37, 539 P.3d at 555 (quoting *Dist. Ct.*, 793 P.2d at 168). The Colorado Supreme Court

> laid out several factors that a court must consider when fashioning discovery sanctions: "(1) the reason for and degree of culpability associated with the violation; (2) the extent of resulting prejudice to the other party; (3) any events after the violation that mitigate such prejudice; (4) reasonable and less drastic

24

alternatives to exclusion; and (5) any other relevant facts."

*Id.* (quoting *People v. Cobb*, 962 P.2d 944, 949 (Colo. 1998)).

¶ 58    The court did not reach the issue of whether the prosecution violated Crim. P. 16 by failing to provide the use of force reports to the defense because the court determined that the Department's actions were sufficiently egregious to warrant a sanction. Accordingly, the court dismissed the two counts relating to McKain's interactions with the officers but not the counts relating to Graber and James.

¶ 59    McKain argues that the court erred by not considering the motion for sanctions before the trial started and, thereby, allowing the jurors to hear inadmissible evidence about McKain's interaction with the officers after they returned to the house. He further argues that "[d]ismissal of the entire case was the only appropriate remedy" in the absence of any reason for the delay in producing the reports "besides negligence at best, or at worst, a cover-up of exculpatory evidence." But "dismissal . . . should be a disfavored remedy reserved for rare cases." *Id.* at ¶ 69, 539 P.3d at 560. In addition, defense counsel did not file the motion for sanctions until the day

before trial, and the court began to address the sanctions issue the next morning, before the prospective jurors entered the courtroom.

¶ 60 The record shows that the court appreciated the gravity of McKain's concerns and the frustration of the waiting venire. The court allowed four witnesses to explain why the Department's records custodian had not produced the reports to the defense, it did not admit evidence at trial showing that McKain physically resisted arrest, it agreed with defense counsel that the untimely disclosure of the use of force reports prejudiced McKain, and it granted the defense relief by dismissing the two counts relating to McKain's interactions with the officers the second time they came to the house.

¶ 61 In addition, the court instructed the jury not to consider any evidence concerning the dismissed counts. "Absent evidence to the contrary, a jury is presumed to understand and follow the trial court's instructions." *Chase*, ¶ 37, 411 P.3d at 750. Nothing in the record suggests that the jury did not understand or did not follow the court's instruction to disregard the evidence relating to the dismissed counts. Under the circumstances, the court did not abuse its discretion by declining to dismiss the entire case.

C. The Court Did Not Err by Denying McKain's Motion to Dismiss Based on the Prosecution's Failure to Produce Deputy Yelton's and Graber's Medical Records and Unedited Versions of the Photos of Graber's Injuries

1. Standard of Review

¶ 62 "[Q]uestions of rule interpretation are questions of law subject to de novo review." *People v. Dye*, 2024 CO 2, ¶ 34, 541 P.3d 1167, 1175. Trial courts possess the discretion to resolve discovery issues. *People v. Bueno*, 2013 COA 151, ¶ 10, 411 P.3d 62, 67, *aff'd*, 2018 CO 4, 409 P.3d 320. Similarly, "[w]e review a trial court's evidentiary rulings for an abuse of discretion." *Campbell v. People*, 2019 CO 66, ¶ 21, 443 P.3d 72, 76.

2. Additional Facts

¶ 63 Defense counsel also argued in the motion for sanctions that the prosecution violated Crim. P. 16 by failing to produce Graber's and Deputy Yelton's medical records (the medical records) documenting the injuries they suffered on the night of the incident and by producing edited photos of Graber's injuries but not the unedited photos.

¶ 64 The prosecutor told the court that the "medical records [were] not in [her] possession or control." She noted that she "could get a

waiver from the victims in this case" to obtain the records. If she could not obtain such a waiver, however, she said she would need to use a subpoena to get them, "which is exactly what [the defense] would have to do" to obtain the medical records.

¶ 65    The court found that, under Crim. P. 16, the prosecution was not required to "affirmatively go and get" the medical records. Accordingly, the court denied the portion of the motion for sanctions premised on the prosecution's failure to produce the medical records.

¶ 66    Defense counsel also argued that the prosecution violated Crim. P. 16 by turning over photos of Graber's injuries that Graber edited to label the body parts depicted instead of producing the original unedited photos. The prosecution explained that Graber had not provided unedited copies of the photos.

¶ 67    In response to the court's questions at trial, Graber said that she added the text to the photos but made no other modifications. Graber testified that the original versions of the photos "were on [her] telephone" and that she had "probably not" saved them. She said that she had tried to find the original photos on the "cloud" but

had been unable to locate them. The court admitted the edited photos into evidence, finding they were sufficiently reliable.

### 3. The Medical Records

¶ 68 McKain contends the prosecution violated Crim. P. 16 by "deliberately cho[osing] to not obtain medical records for either listed victim, [Deputy Yelton] . . . in the felony case nor [Graber] in the joined misdemeanor case." He argues that "[t]he prosecution had a duty to discover medical records pursuant to Crim. P[]. 16(I)(a)(1)(III) and failed to do so."

¶ 69 Crim. P. 16(I)(a)(1)(III) says,

> (1) The prosecuting attorney shall make available to the defense the following material and information which is within the possession or control of the prosecuting attorney, and shall provide duplicates upon request, and concerning the pending case:
>
> . . . .
>
> (III) Any reports or statements of experts made in connection with the particular case, including results of physical or mental examinations and of scientific tests, experiments, or comparisons.

"Crim. P. 16 ensures that a defendant has access to material and information in the government's possession or control, but it does not address a defendant's ability to access material and information

29

held by private third parties." *People in Interest of E.G.*, 2016 CO 19, ¶ 14, 368 P.3d 946, 950; *see also Solano*, ¶ 49 n.4, 559 P.3d at 269 n.4 ("Generally, a court will not deem the prosecutor to be in constructive possession of information from private entities or individuals.").

¶ 70 The record establishes that the medical records were not within the prosecution's possession or control. The prosecution did not need the medical records to prove its case, as proof of "[b]odily injury" for purposes of second degree and third degree assault requires a showing of "physical pain, illness, or any impairment of physical or mental condition." § 18-1-901(3)(c), C.R.S. 2024. The prosecution proved Graber's bodily injuries through photos depicting the injuries and her testimony that she suffered painful bruises and scrapes as a result of her altercation with McKain. Because the court dismissed the second degree assault count, Deputy Yelton did not testify about his injuries resulting from his interaction with McKain.

¶ 71 Although the prosecution and the court advised defense counsel that she could subpoena the medical records, she insisted that doing so was the prosecution's responsibility. But the

prosecution did not violate the discovery rules by not producing medical records that were not within its possession or control. *See* Crim. P. 16(I)(a)(3) ("The prosecuting attorney's obligations under this section (a) extend to material and information in the possession or control of members of his or her staff and of any others who have participated in the investigation or evaluation of the case and who either regularly report, or with reference to the particular case have reported, to his or her office.").

¶ 72 Therefore, the court did not abuse its discretion by concluding that the prosecution did not violate Crim. P. 16 by not providing the medical records to the defense.

### 4. The Edited Photos

¶ 73 Defense counsel moved for sanctions because the prosecution only produced versions of the photos depicting Graber's injuries containing the "left leg" and "right hip" labels. For this reason, defense counsel argued that the photos were inadmissible. McKain contends on appeal that the court erred by not imposing sanctions against the prosecution for its failure to produce unedited versions of the photos and by admitting the photos into evidence. We disagree.

31

¶ 74    Because the prosecution did not have the original photos in its possession or control, there was no discovery violation and no sanctionable conduct. *See* Crim. P. 16(I)(a)(1)(IV). The court did not need to dismiss McKain's case because the prosecution did not provide the defense with versions of the photos that were not within the prosecution's possession or control. *See* Crim. P. 16(I)(a)(3).

¶ 75    McKain further contends that the photos were inadmissible under CRE 1002 ("To prove the content of a writing, recording, or photograph, the original writing, recording, or photograph is required, except as otherwise provided in these rules or by statute of the State of Colorado or of the United States.") and CRE 1003 ("A duplicate is admissible to the same extent as an original unless (1) a genuine question is raised as to the authenticity of the original or (2) in the circumstances it would be unfair to admit the duplicate in lieu of the original."). McKain specifically argues that, "[b]y allowing the edited pictures to come in, the court incorrectly allowed evidence into trial in violation of CRE 1002 and 1003, and erroneously allowed testimony from [Graber] that the defense had no opportunity to properly confront, cross-examine, and impeach."

¶ 76    "[T]he standard for authentication is minimal — all that's required is a prima facie showing that the evidence is what its proponent claims." *Gonzales v. People*, 2020 CO 71, ¶ 42, 471 P.3d 1059, 1067.  Because Graber testified that the photos accurately depicted her injuries and she only edited the pictures by inserting the labels, the prosecution made the required prima facie showing that the evidence was what its proponent claimed.  This showing, "combined with rigorous cross-examination, sufficiently assure[d] accuracy to submit the question of authenticity to the jury."  *Id.*

¶ 77    Further, the jury saw other, unedited photos of Graber's injuries (which were admitted without objection), it heard Graber's description of how she edited the photos by adding the "left leg" and "right hip" labels, and defense counsel had the opportunity to cross-examine Graber about the edited photos.  For these reasons, the court did not abuse its discretion by admitting the edited photos into evidence.

### 5. The Court Did Not Violate McKain's Confrontation Clause Rights by Not Requiring the Prosecution to Produce the Medical Records and the Unedited Photos

¶ 78    McKain contends that the court violated his Confrontation Clause rights under the United States and Colorado Constitutions by not requiring the prosecution to produce the medical records and unedited versions of photos of Graber's injuries. *See* U.S. Const. amend. VI; Colo. Const. art. II, § 16. "The right of a defendant to confront adverse witnesses is guaranteed by the Sixth and Fourteenth Amendments and includes an opportunity for effective cross-examination." *People v. Herrera*, 87 P.3d 240, 253 (Colo. App. 2003).

¶ 79    "[T]he right to confrontation is a trial right; it is not 'a constitutionally compelled rule of pretrial discovery.'" *Spykstra*, 234 P.3d at 670 (quoting *Pennsylvania v. Ritchie*, 480 U.S. 39, 52 (1987) (plurality opinion)). "Accordingly, in guaranteeing an opportunity for effective cross-examination, the Confrontation Clause does not guarantee 'access to every possible source of information relevant to cross-examination.'" *Id.* (quoting *Dill v. People*, 927 P.2d 1315, 1322 (Colo. 1996)).

¶ 80    McKain relies on *People v. Tresco*, 2019 COA 61, 457 P.3d 112, to support his argument that the court violated his Confrontation Clause rights by allowing Graber to testify about her hospitalization and injuries without requiring the prosecution to produce the medical records.  However, *Tresco* does not support McKain's position.

¶ 81    The defendant in *Tresco* argued that the court violated his Confrontation Clause rights by "admitting an expert's testimony on the victim's nerve damage," even though the expert's notes and medical reports disclosed to the defense "did not mention nerve damage." *Id.* at ¶ 25, 457 P.3d at 120.  The *Tresco* division concluded that the court did not violate the defendant's Confrontation Clause rights by admitting the expert's testimony on nerve damage because the defendant "had the opportunity to cross-examine the expert witness" and "failed to follow up on his discovery motion" seeking production of the prosecution's summary of the expert's testimony. *Id.* at ¶ 27, 457 P.3d at 120.

¶ 82    Contrary to McKain's reading of *Tresco*, the division did not hold in that case that a defendant is entitled to medical records whenever a victim testifies about his or her injuries.  McKain did

not have the right under the Federal and Colorado Confrontation Clauses to obtain Graber's hospital records from the prosecution. *See Spykstra*, 234 P.3d at 670. No representative of the hospital at which Graber was treated testified at trial, Graber did not testify about any diagnosis she received while hospitalized, there were no expert disclosures in the case, and defense counsel cross-examined Graber about her injuries, as well as regarding any edits she made to the photos of her injuries. *See Tresco*, ¶¶ 25-27, 457 P.3d at 120.

¶ 83 Moreover, defense counsel did not need Deputy Yelton's medical records to test his credibility because, in light of the dismissal of the second degree assault and resisting arrest counts, the jury never heard about Deputy Yelton's injuries.

¶ 84 For these reasons, we conclude that the court did not violate McKain's Confrontation Clause rights by not compelling the prosecution to provide the defense with the medical records and unedited versions of the photos depicting Graber's injuries.

### D. The Court Did Not Err by Giving Its Initial Aggressor Jury Instruction

#### 1. Standard of Review

¶ 85    "We review de novo the question of whether jury instructions accurately informed the jury of the law," *Johnson v. People*, 2019 CO 17, ¶ 8, 436 P.3d 529, 531, but "[w]e review a trial court's decision to give, or not to give, a particular jury instruction for an abuse of discretion," *People v. Jones*, 2023 COA 104, ¶ 16, 543 P.3d 419, 424.

#### 2. Controlling Law

¶ 86    Colorado's self-defense statute, section 18-1-704(1), C.R.S. 2024, says,

> Except as provided in subsections (2) and (3) of this section, a person is justified in using physical force upon another person in order to defend himself or a third person from what he reasonably believes to be the use or imminent use of unlawful physical force by that other person, and he may use a degree of force which he reasonably believes to be necessary for that purpose.

Subsection (3)(b) of section 18-1-704 explains that an "initial aggressor" is not justified in using physical force unless "he or she withdraws from the encounter and effectively communicates to the

other person his or her intent to do so, but the latter nevertheless continues or threatens the use of unlawful physical force."

¶ 87 "[T]o have the jury instructed on self-defense as an affirmative defense, a defendant must present some credible evidence to support that defense." *People v. DeGreat*, 2018 CO 83, ¶ 22, 428 P.3d 541, 545. Similarly, "courts must ensure that there is some evidence in support of an exception to the affirmative defense of self-defense before instructing the jury on that exception." *Galvan v. People*, 2020 CO 82, ¶ 32, 476 P.3d 746, 755.

### 3. Additional Facts

¶ 88 Graber testified that, after hearing McKain "beating on [the basement] door" and "shouting profanities," she walked up the basement stairs while her phone was recording. She testified that McKain "slap[ped] [her] in the face, knocking [her] phone from [her] hands" and causing her phone to "fall[] down the stairs." The video from Graber's phone shows McKain saying, "Or what?" and then swinging at Graber, causing the phone to fall partway down the stairs, where it continued to record.

¶ 89 In addition, McKain testified that

> while [Graber] [was] stepping towards [him], she[] [was] pulling out her phone[,] and she[] [was] going to kind of jam it in [his] face . . . . [Then] [his] hand connected with the top of the phone, causing it to kind of . . . cartwheel down the steps.

McKain further said that, "immediately after [he] smacked the phone out of her hands[,] . . . she started punching [him] in the face . . . [and] got a good six shots in before [he] finally pushed her off of [him]."

¶ 90 The appellate record does not include a transcript of the jury instruction conference. However, at the defense's request, the parties made a record of their discussion of the initial aggressor portion of the self-defense instruction. Defense counsel argued that the court should not give the jury *any* initial aggressor instruction, arguing that McKain's testimony that Graber "essentially stuck the phone in [his] face" was "sufficient for [McKain] to react in self-defense."

¶ 91 The court found that the prosecution had met its burden to obtain an initial aggressor instruction because McKain

> testified that he wanted to wake them [his housemates] up, wanted to be a jerk, came stomping in, was clearly insulting them[,] and yelling at them and using those verbal

> comments . . . . But he also hit a hole in the door and smacked the phone out of [Graber's] hand.

¶ 92    Defense counsel tendered the following proposed "initial aggressor" instruction after the court determined that the evidence warranted such an instruction: "Words alone do not make a person an initial aggressor. Neither do insults make a person an initial aggressor. Finally, an aggressive step does not make a person an initial aggressor. Only a threat to use unlawful, imminent, physical force makes a person an initial aggressor." The court declined to give the tendered instruction. Rather, the court provided the jury with the Colorado model self-defense instruction and the model initial aggressor language. *See* COLJI-Crim. H:11 (2023).

¶ 93    During deliberations, the jury asked for a definition of "initial aggressor." The defense again tendered its proposed "initial aggressor" instruction. Instead, the court provided the jury with a "hybrid" definition that said "words alone" do not make a person an initial aggressor, and it rejected the defense's proposed language that "an aggressive step doesn't make a person an initial aggressor" because such language was "vague."

¶ 94    Accordingly, the court's supplemental instruction said:

40

An "initial aggressor" is a person who initiates the physical conflict by using or threatening the imminent use of unlawful physical force. Words alone do not make a person an initial aggressor.

Except as provided herein, you have been provided all of the evidence in this case[,] and I direct you to the evidence presented during the trial and the instructions you have already been provided.

### 4. The Initial Aggressor Jury Instruction

¶ 95 The court correctly gave an initial aggressor instruction because some evidence supported it.

¶ 96 In *Galvan*, the supreme court said that, "when the trial court instructs the jury on the affirmative defense of self-defense, it should instruct the jury on the provocation exception or any other exception to that defense if the exception is supported by some evidence." *Galvan*, ¶ 25, 476 P.3d at 754. In addition, the evidence must be "viewed in the light most favorable to giving the instruction." *Id.* at ¶ 33, 476 P.3d at 756.

¶ 97 In arguing that no evidence supported an initial aggressor instruction, McKain focuses on his testimony that Graber put the phone in his face and punched him after he knocked the phone out of her hands. But Graber testified differently — that McKain

41

slapped her first — and the video shows McKain swinging at her. Thus, the court did not err by giving a jury instruction on the initial aggressor exception because some evidence supported it.

¶ 98 McKain also contends that, even if the court did not err by deciding to give an initial aggressor instruction, the court erred by not giving *his* proposed instruction on initial aggressor, which said that "an aggressive step does not make a person an initial aggressor." The "aggressive step" language comes from *Castillo v. People,* which addressed the evidence required to support an initial aggressor instruction when the defendant "initiated the physical conflict by *threatening* the imminent use of unlawful physical force." 2018 CO 62, ¶ 51, 421 P.3d 1141, 1150.

¶ 99 The supreme court noted in *Castillo* that, "[v]iewing the evidence in the light most favorable to the prosecution, [the defendant] cursed at the man, popped his trunk, and then got out of his car." *Id.* at ¶ 53, 421 P.3d at 1150. The court determined that "popping the trunk and getting out of the car [was], at most, an aggressive step," but that it did not "threaten[] the imminent use of unlawful physical force." *Id.* This conduct therefore did not

42

support an initial aggressor jury instruction. *Id.* at ¶ 54, 421 P.3d at 1150.

¶ 100    We agree with the court that McKain's tendered instruction was vague. In *Castillo,* the supreme court did not create a new "initial aggressor" definition for use in jury instructions. The supreme court has long cautioned

> that language used in an opinion pertinent to the issues and the determined facts in that case may be a proper expression of the law as related to those facts and issues, and pertinent to a decision of the case, and yet may not be sufficiently general, clear, or accurate to serve as a satisfactory or full instruction to a jury.

*Cohen v. People,* 103 P.2d 479, 480 (Colo. 1940). Therefore, the court did not err by declining to instruct the jury that "an aggressive step does not make a person an initial aggressor."

¶ 101    For these reasons, the court did not err either by giving the jury an instruction on initial aggressor or by rejecting McKain's version of such an instruction.

E.    The Court Did Not Abuse Its Discretion by Declining to Give First Amendment and Implicit Bias Jury Instructions

¶ 102   McKain further contends that the court erred by not giving the jury his proposed First Amendment and implicit bias instructions. We disagree.

1.    Additional Facts

¶ 103   McKain tendered the following implicit bias instruction:

> You must follow certain rules while conducting your deliberations and returning your verdict:
>
> Do not decide the case based on "implicit biases." Everyone, including me, has feelings, assumptions, perceptions, fears, and stereotypes, that is, "implicit biases," that we may not be aware of.
>
> These hidden thoughts can impact what we see and hear, how we remember what we see and hear, and how we make important decisions. Because you are making very important decisions in this case, I strongly encourage you to evaluate the evidence carefully and to resist jumping to conclusions based on personal likes or dislikes, generalizations, gut feelings, prejudices, sympathies, stereotypes, or biases.
>
> The law demands that you return a just verdict, based solely on the evidence, your individual evaluation of that evidence, your reason and common sense, and the instructions provided by the Court. Our system of justice is counting on you to render

a fair decision based on the evidence, not on biases.

¶ 104    McKain also tendered a First Amendment instruction:

> The First Amendment to the United States Constitution protects the Freedom of Speech. Just because you might find the statements made by Mr. Mckain [sic] offensive, does not mean they were made in violation of his right to Free Speech. You should not draw an inference in this case from what you may consider offensive speech.

¶ 105    The court rejected both instructions. The record does not reflect McKain's arguments for giving these instructions.

### 2.    The Court's Refusal to Give McKain's First Amendment and Implicit Bias Instructions

¶ 106    McKain contends the court abused its discretion by not giving his proposed jury instructions on the First Amendment and implicit bias because the jury heard testimony about, and saw videos of, McKain cursing and using slurs while interacting with the officers.

¶ 107    Sergeant Sapp testified to the following:

> At one point, I believe he said a racial slur. And I asked him to repeat what he said, he didn't say it again, so I may have misheard him. But he was using some very foul language, calling us different types of names, basically saying he was refusing to sign [the summons], and we told him that, you know, if

45

> we have to come back that this may escalate to more charges.

The videos shown to the jury depict McKain uttering profanities and using slurs against the officers.

¶ 108    We do not consider the merits of McKain's argument regarding the First Amendment instruction because he did not sufficiently develop it in his opening brief.  We will not review "contentions that have not been 'sufficiently developed.'" *People v. Thompson*, 2017 COA 56, ¶ 199, 413 P.3d 306, 337.  He does not point to any Colorado case holding that a court errs by failing to give a First Amendment instruction, much less by not giving such an instruction when the defendant employed harsh language while interacting with peace officers.

¶ 109    In addition, the court was not required to give McKain's tendered implicit bias instructions.  The court instructed the jury not to let bias influence its decision: "Remember, you must not be influenced by sympathy, bias, or prejudice in reaching your decision.  You should not allow bias or any kind of prejudice based upon gender to influence your decision."

¶ 110    McKain relies on *People v. Toro-Ospina*, 2023 COA 45, 535 P.3d 132, to support his contention that he was entitled to his proposed implicit bias instruction. However, *Toro-Ospina* does not establish that the court abused its discretion by not giving McKain's proposed instruction.

¶ 111    The facts in *Toro-Ospina* are materially different from those in this case. In *Toro-Ospina,* the division noted that

> [t]he importance of jurors being reminded of the risk that their judgments may be skewed by implicit biases is arguably more salient in a case such as this, in which most of the People's witnesses testified in English, but Toro-Ospina testified in Spanish, thus necessitating translation of his testimony into English.

*Id.* at ¶ 44, 535 P.3d at 141.

¶ 112    Nonetheless, the division concluded "for two independent reasons" that "the court's decision not to give the requested instruction" did not require reversal of the defendant's convictions. *Id.* at ¶ 45, 535 P.3d at 141. First, "[u]ntil such time as the General Assembly or the Colorado Supreme Court requires an implicit bias instruction, the decision whether to give such an instruction rests with the trial court." *Id.* at ¶ 47, 535 P.3d at 141-42. Second,

during voir dire, an "exchange between [the defendant's] counsel and [a prospective juror] thoughtfully articulated the inherent risks of implicit bias and the need to be mindful of those concerns in the deliberative process." *Id.* at ¶ 48, 535 P.3d at 142.

¶ 113 McKain argues that *Toro-Ospina* is distinguishable because, in his case, there was no discussion of implicit bias during voir dire. However, the division's conclusion in *Toro-Ospina* rested on independent rationales that also apply here. The General Assembly and the supreme court chose not to require courts to give implicit bias jury instructions. *See id.* at ¶ 47, 535 P.3d at 141-42. In addition, implicit bias was a lesser concern in this case than in *Toro-Ospina.* Unlike the defendant in *Toro-Ospina,* who sought to counteract possible bias against him premised on his race or nationality, McKain tendered his proposed implicit bias instruction to soften the impact of the harsh language he directed toward the officers.

¶ 114 For three reasons, the court did not abuse its discretion by declining to give McKain's proposed implicit bias jury instruction. First, as noted above, the court instructed the jurors not to allow bias to affect their decisions. Second, defense counsel argued in

closing that the jury must not consider McKain's language when deciding whether he was guilty. Third, defense counsel reiterated the importance of abandoning biases when deliberating. Therefore, on several occasions, the court and defense counsel reminded the jury that it should not consider McKain's words toward the officers when deciding whether the prosecution had proved its case. Furthermore, we are not aware of, and McKain does not cite, any case holding that a court must give an implicit bias instruction to ensure the jury does not convict the defendant based on his use of offensive language.

¶ 115    Accordingly, the court did not abuse its discretion by not giving McKain's tendered instructions on the First Amendment and implicit bias.

### F.    We Do Not Consider Whether the Cumulative Effect of Any Errors Requires Reversal

¶ 116    Because we reject McKain's contentions of error, we reject his cumulative error argument, which he raises for the first time in his reply brief. *See People v. Shannon*, 2024 COA 41, ¶ 34, 553 P.3d 239, 248 ("Because we haven't found any errors, [the defendant's] contention that reversal is warranted under the cumulative error

doctrine is untenable."). Moreover, we do not address the merits of appellate arguments presented for the first time in a reply brief. *See People v. Fogle*, 116 P.3d 1227, 1230 (Colo. App. 2004) (issues raised for the first time in the reply brief on appeal will not be considered).

### III.    Disposition

¶ 117    The judgment is affirmed.

JUDGE JOHNSON and JUDGE MOULTRIE concur.